**James M. Barrett, SBN 49126**
Lawyer
150 E. Cotati Avenue
Cotati, California 94931
Telephone: (707) 795-1510
Fax: (707) 795-3364
E-mail: jimmarleyb@aol.com

**Marvin Pederson, SBN 85258**
Attorney at Law
1160 N. Dutton Avenue, Suite 150
Santa Rosa, CA 95401
Telephone: (707) 544-9444
Fax: (707) 544-5829
E-mail  pederson@marvlaw.com

Attorney for Plaintiff
HARRY DONALD FISHER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRY DONALD FISHER,<br><br>　　　Plaintiff,<br><br>vs.<br><br>DOWNEY SAVINGS AND LOAN ASSOCIATION, et al.,<br><br>　　　Defendants.<br>_____/ | NO. C 08-02144 EDL<br><br>**PLAINTIFF HARRY DONALD FISHER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>Accompanying Documents:<br><br>1.　Ex Parte Application;<br>2.　Declaration of James M. Barrett;<br>3.　Declaration of Harry Donald Fisher;<br>4.　Declaration of Ed Rau;<br>5.　Proposed Order.<br><br>DATE:　　June 10, 2008<br>TIME:　　9:00 a.m.<br>Courtroom　　E |

////

////

1

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. INTRODUCTION AND SUMMARY OF FACTS

A.  Summary of Argument

This application for an *Ex Parte* Temporary Restraining Order and Order to Show Cause re Preliminary Injunction is brought by plaintiff HARRY DONALD FISHER, to stop defendant DOWNEY SAVINGS AND LOAN ASSOCIATION (hereinafter "Downey Savings"), who has an invalid mortgage on the Property, from foreclosing on the plaintiff's principal residence. Unless enjoined, defendant Downey Savings' actions will result in the forced foreclosure of plaintiff's principal residence soon after April 18, 2008, leave plaintiff homeless and with a loss of all of his equity, with severely damaged credit, and without an appropriate remedy available from the pending legal action before this Court.

B.  Background and Summary of the Facts

Plaintiff, DOB 04/25/34, is a single man, and the owner of his principal residence located at 2335 Marsh Court, Santa Rosa, California 95403 (hereinafter "the Property"). Plaintiff's highest grade level completed was 12th grade, receiving a high school diploma in 1953.

Plaintiff purchased the subject Property in the spring of 2000. In 2004, plaintiff refinanced the original mortgage on the Property, and eventually secured an adjustable rate mortgage with Impact Lending, who then sold the mortgage to Countrywide Home Loans. That mortgage was a 30-year loan, and the interest rate was fixed at 5% for the first five years.

On September 22, 2004, plaintiff underwent a complete replacement of his right knee. On November 26, 2004, while convalescing from that right knee replacement, plaintiff slipped and fell in a movie theater and suffered a displaced fracture of his right femur.

Plaintiff had an extended period of convalescence following his November 2004 accident. He required the use of a wheelchair for ambulation through June 2005. He was prescribed

2

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

narcotic pain medication following surgery, and was regularly taking the prescribed amount as needed for pain, at least through June 2005.

In March 2005, plaintiff's monthly mortgage payment to Countrywide Home Loans was in the amount of $1,366.67. The monthly mortgage amount was scheduled to increase to $1,733.57 effective April 1, 2009.

In addition to the Countrywide mortgage, plaintiff had a home equity line of credit with GreenPoint Mortgage, with a monthly payment amount of approximately $303. The GreenPoint home equity loan had an interest rate of 5.058%, and was a 20-year loan.

Thus, as of March 2005, plaintiff's combined monthly mortgage payments totaled $1,669.67. Beginning April 1, 2009, plaintiff's combined monthly mortgage payments were expected to increase to a total of $2,036.57.

On or about March 2005, plaintiff received a cold call telephone solicitation from a representative of defendant EQUITY ONE FINANCIAL CORP. (hereinafter "Equity One"), a mortgage broker. In speaking to the Equity One representative, he told plaintiff that he could offer a 1% mortgage on the Property, reduce plaintiff's monthly payments, and allow plaintiff to take several thousand dollars of equity out of the house for his personal use. All discussions were done by telephone, as Equity One's representative was based in southern California.

At the request of defendant Equity One's representative, plaintiff mailed documents verifying that his income was derived from two sources: (1) Retirement benefits from PG&E in the monthly amount of $1,324.94, and (2) Social Security benefits in the monthly amount of $1,054.00, for a total monthly income of $2,379.94. Those documents consisted of a Statement of Annuity Payment from PG&E, and a statement of benefits from Social Security. At all times relevant hereto, those amounts have been the same.

////

1      In late May 2005, plaintiff was on vacation in southern California, staying at the
2 Disneyland Hotel. While in southern California, plaintiff spoke with the Equity One
3 representative by telephone, who told him that someone would meet with plaintiff the following
4 day to sign loan documents. Plaintiff received a message in his room that someone was waiting
5 for plaintiff down in the lobby. Upon descending to the lobby, plaintiff was met by a woman
6 who represented that she was there on behalf of defendant Downey Savings and defendant Equity
7 One. The woman had a large stack of papers for plaintiff to sign, pertaining to a loan and
8 mortgage from defendant Downey Savings.
9      The Downey Savings/Equity One representative announced that she was a notary public,
10 and plaintiff, upon her instruction, signed her notary book. At the urging of the notary public,
11 plaintiff glanced through but did not thoroughly read the lengthy loan documents, based on the
12 representative's assurance that the loan documents accurately reflected all of the information
13 plaintiff had previously provided to the original Equity One representative he had been speaking
14 with, and that the loan documents did not contain any information other than what had previously
15 been supplied. Plaintiff estimates that the loan signing process in the hotel lobby took
16 approximately twenty (20) minutes.
17      At the time of the signing of the subject loan document, plaintiff was still taking heavy
18 doses of narcotic pain medication and was unable to walk more than 50 feet without use of a
19 front-wheeled walker. Plaintiff's primary mode of ambulation was via use of a wheelchair.
20      An unsigned copy of the loan documents was simultaneously provided to plaintiff by the
21 representative of defendants Downey Savings and Equity One, after she had collected the
22 signatures she needed on the original set of loan documents, with the assurance that they were a
23 true copy of the documents plaintiff had just signed, and contained all of the same information,
24 specifically including the sum and composition of his fixed monthly income of $2,379.94,
25
26

4

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

consisting of monthly retirement income from PG&E of $1,324.94, and monthly Social Security benefits of $1,054.00.

Contrary to the representations of the agent, representative and/or employee of defendant Downey Savings and defendant Equity One, the information regarding plaintiff's income had been altered, grossly and falsely exaggerated, and stated so that it would appear, falsely and fraudulently, that plaintiff's monthly income would qualify him for the subject loan. Plaintiff's monthly fixed income of $2,379.94 had, unknown to plaintiff, been falsely and fraudulently increased on the application, claiming that plaintiff's monthly income was precisely $8,000 per month. Such a sum was never indicated by plaintiff, during any part of his prior conversations with defendant Equity One. The false representation of plaintiff's monthly income was supplied by defendant Equity One and its agents and/or representatives.

The falsely and fraudulently inflated monthly income figure of $8,000 that appeared on plaintiff's loan documents, which documents were filled out by defendant Equity One, apparently qualified plaintiff for the loan with defendant Downey Savings; when, in fact, with his actual income, plaintiff would not have so qualified for the loan.

In agreeing to refinance his existing mortgage, plaintiff relied upon the statements made by the representative of defendant Equity One. Plaintiff's lack of education beyond a high school diploma, combined with his advanced age and lack of mental acuity due to his narcotic pain medications, only exacerbated his reliance upon the representations of defendant Equity One's representative. Further, these factors reduced plaintiff's ability to understand and intelligently comprehend the entirety of the loan documents, including, but not limited to, the application which falsely and fraudulently stated plaintiff's income at $8,000 per month.

////

////

5

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

On or about May 25, 2005, the loan described as Loan No. 9041680158 (hereinafter the "subject transaction"), in which defendant Downey Savings was the lender, closed.

Defendant Equity One received a total of $21,009.68 from Downey Savings for the subject loan transaction, as follows: $7,999.68 origination fee, $495 processing fee, $35 credit report fee, and $12,480 as a "rebate."

The monthly payment schedule contained in the loan documents indicated that plaintiff would initially pay $1,071.67 for the first 12 months of the loan. Thereafter, payments would increase to $1,152.05 for the next 12 month, then to $1,238.45 for the following 12 months. After that, payments would increase to $1,331.33 for seven months, and finally reach $2,578.43 per month, for the remaining 436 months of the loan.

However, what the Federal Truth-in-Lending Disclosure Statement did not reveal was that the payment amounts listed on the schedule were "minimum" payments, which would not cover monthly principal and interest. Each time that plaintiff made a minimum payment, his principal balance due increased by $2,027.05. In order to pay the monthly principal and interest, plaintiff would actually have to pay $3,308.93 per month, or $928.99 more than his fixed monthly retirement income.

After reviewing the loan documents, plaintiff telephoned the Equity One representative with whom he had been dealing, and told him that he would be unable to make the increased payments that would occur several years down the line. The Equity One representative told plaintiff not to worry about that, and that the most he would have to pay in addition to the original monthly payment amount, was $50.

Because of plaintiff's advanced age, pre-existing right leg problems, and health history of hypertension and obesity, he is unable to return to the workforce to supplement his fixed retirement income.

6

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

In July 2007, plaintiff was notified by defendant Downey Savings that his monthly mortgage payment would be increasing to $3,369.14, effective September 1, 2007.

In or about September 2007, plaintiff became one month delinquent in his current mortgage with defendant Downey Savings, on his principal residence located at 2335 Marsh Court, Santa Rosa, California 95403.

On October 5, 2007, defendant Downey Savings sent plaintiff a Notice of Intent to Foreclose on plaintiff's home loan with them.

On November 7, 2007, defendant Downey Savings sent further correspondence to plaintiff, notifying him that "Foreclosure proceedings on your property located at 2335 March Court, Santa Rosa, CA 95403, have begun."

On December 10, 2007, defendant Downey Savings, via their agent, defendant FCI Lender Services, Inc., mailed a Notice of Default and Election to Sell Under Deed of Trust to plaintiff. The form indicated that the original "Notice" had been recorded on December 21, 2007, and that "No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice)."

On or about March 24, 2008, defendant FCI Lender Services, Inc. mailed a Notice of Trustee's Sale, setting the date of public sale of plaintiff's property for April 18, 2008 at 11:30 a.m.

Unless a temporary restraining order is granted, preventing further action and progress on the above-referenced "foreclosure proceedings," irreparable injury will result to plaintiff in that he will be forced out of his home by authority and action of the County Sheriff and the title to the Property will be transferred out of plaintiff's name and into the ultimate purchaser. This will result in the irretrievable loss of equity in the Property in an approximate amount of several hundred thousand dollars. The harm is irreparable once the property is foreclosed upon and sold.

7

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

1  This Court will not be able to undo the transaction, thereby denying plaintiff the substance of the
2  relief sought, and he will be homeless.

## II. THE LEGAL STANDARD FOR INTERIM INJUNCTIVE RELIEF

The primary purpose of a preliminary injunction is to preserve the *status quo* until a court can make a final determination on the merits of the action. (See *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528, 67 Cal.Rptr. 761,771.) A temporary restraining order ("TRO") is properly granted on *ex parte* notice in order to maintain the *status quo* or to prevent irreparable injury pending a hearing on the Application for a preliminary injunction. (Code Civ. Proc., Section 527(c); see also 6 Witkin, Cal. Procedure (4th ed. 1997), Provisional Remedies, Section 286, p. 227).

The Ninth Circuit has described two sets of criteria for preliminary injunctive relief. Under the "traditional" criteria, a plaintiff must show (1) the probability of irreparable injury if the relief is denied; (2) a strong likelihood of success on the merits; (3) the balance of potential harm favors the plaintiff; and, depending on the nature of the case, (4) the public interest favors granting relief. *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir., 1995). An alternative test in the Ninth Circuit allows the moving party to prevail by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury if the relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Id.*

## III. PLAINTIFF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM UNLESS A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE ISSUED AND DEFENDANT WILL SUFFER RELATIVELY INCONSEQUENTIAL HARM

Defendants Downey Savings' and FCI Lender Services' foreclosure of plaintiff's primary residence will cause him immediate harm, in that he will be forced out of his property by

8

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**

1 authority and action of a local deputy Sheriff and the title to the Property will be transferred out
2 of his name and into the ultimate purchaser. The harm is irreparable because once the property is
3 foreclosed upon and sold, this Court will not be able to readily undo the transaction, thereby
4 denying plaintiff the substance of his relief sought.

5       Defendant Downey Savings will suffer comparatively little harm if the Court issues a
6 temporary restraining order and preliminary injunction. As is shown by the declaration of Ed
7 Rau, served and filed concurrently herewith, the current market value of the Marsh Court
8 property is $449,000.00. While the current amount claimed to cure the default is estimated at
9 $488,095.54, the actual amount financed according to the Truth-in-Lending disclosure statement
10 (Exhibit 5 to the Declaration of Harry Donald Fisher, served concurrently herewith) is
11 **$406,381.56**. Also for this reason, the Court should not require a bond as a pre-condition to
12 issuing a temporary restraining order and a preliminary injunction, or any bond should be in a
13 minimal amount.

14 DATED: June 4, 2008

16 _____
JAMES M. BARRETT
Attorney for Plaintiff
17 HARRY DONALD FISHER

Fisher v. Downey Savings & Loan Assn., et al.
**Plaintiff's Memorandum of Points and Authorities in Support of Ex Parte Application for TRO and OSC re: Preliminary Injunction**