James M. Barrett, SBN 49126
Lawyer
150 E. Cotati Avenue
Cotati, California  94931
Telephone:	(707) 795-1510
Fax:		(707) 795-3364
E-mail		jimmarleyb@aol.com

Marvin Pederson, SBN: 85258
Attorney at Law
1160 N. Dutton Avenue, Suite 150
Santa Rosa, CA 95401
Telephone: (707) 544-9444
Facsimile: (707) 544-5829

Attorneys for Plaintiff
HARRY DONALD FISHER

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

| | |
|---|---|
| HARRY DONALD FISHER,<br><br>    Plaintiff,<br><br>vs.<br><br>DOWNEY SAVINGS AND LOAN ASSOCIATION, et al.,<br><br>    Defendants. | No. NO. C 08-02144 EDL<br><br>**PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT**<br><br>Pretrial Conf: August 4, 2009<br>                    2:00 p.m.<br>                    Rm. E, 15th Fl.<br><br>Trial Date:    August 31, 2009 |

Pursuant to this Court's August 8, 2008 Pretrial Order, Paragraph 5.c.(3), plaintiff submits the following information concerning plaintiff's expert witnesses.

1. Plaintiff's expert witnesses at trial will be Steven Krystofiak and Michael L. Torr.

2. <u>Steven Krystofiak</u>

The following is a brief narrative statement of the qualifications of this expert witness:

Mr. Krystofiak is a licensed real estate broker and is a founder of the Mortgage Broker Association for Responsible Lending.  His California Broker's License number is 01341058.  In June of 2006  Mr. Krystofiak gave oral testimony at the Federal Reserve Board Hearings on "Responsible Lending and Informed Consumer Choice."  In July of 2007 Mr. Krystofiak delivered written testimony to the Federal Reserve Board on stated

income loans and their association with fraud. In February of 2007 Mr. Krystofiak gave oral testimony at the California State Senate Hearings on "non-traditional mortgage products." In March of 2007 he gave oral testimony at the California State Senate Hearings on "reactions to the recent sub-prime mortgage collapse." He has a Bachelor of Science degree in real estate from San Diego State University. He has publications in the journal *Inman News*. He has been an independent mortgage broker in Redwood City, California since 2005 and worked with Mortgage and Realty Professionals Services in La Jolla, California from 2002 to 2005 as a loan officer.

Mr. Krystofiak's report is attached to this Declaration.

3. Michael L. Torr

The following is a brief narrative statement of the qualifications of this expert witness:

Mr. Torr is a California probate referee and is a licensed real estate broker and appraiser.

_____
MARVIN PEDERSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRY DONALD FISHER,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>DOWNEY SAVINGS AND LOAN ASSOCIATION, EQUITY ONE FINANCIAL CORP, ET AL.,<br><br>　　　　　　Defendants. | Case No.  C-08-02144 (EDL)<br><br>**WRITTEN REPORT OF EXPERT WITNESS BY STEVEN KRYSTOFIAK** |

**PLAINTIFF HARRY DONALD FISHER 26(a)(2) REPORT OF STEVEN KRYSTOFIAK**

　　1.　I make this report on behalf of Plaintiff Harry Donald Fisher ("Mr. Fisher") concerning the transaction that is the subject of the above captioned litigation.  I am being compensated at an hourly rate of $200 per hour for consulting duties and $350 per hour for deposition and testifying duties.

　　2.　My business address is 503 Tiller Lane, Redwood City, CA 94065.

**I.　QUALIFICATIONS**

　　3.　My educational background includes a Bachelor of Science degree in REAL ESTATE from San Diego State University.

　　4.　I am a licensed real estate broker in the State of California.

　　5.　I have significant experience with the requirements and practices in the home mortgage lending industry.  I was a Loan Officer at Mortgage & Realty Professional Services in La Jolla, CA for

2002, 2003, 2004, and 2005.  Since 2005, I have been an independent mortgage broker in Redwood City, CA.

6. I am also the Founder and President of the Mortgage Brokers Association for Responsible Lending, founded in 2006.  The MBARL is an advocacy group protecting consumers and the loan industry from counter productive loan programs.

7. I have been active in analyzing trends in lender and broker practices in both subprime and prime home mortgages since 2002.  I have been published in numerous trade publications on the subject of home mortgages along with loan origination trends. I have been quoted or referenced in numerous other articles in newspapers and publications including but not nearly limited to the Wall Street Journal, Washington Post, San Francisco Chronicle and Money Magazine.

8. I have testified before the California State Senate, California State Assembly and Federal Reserve Board regarding mortgage lending practices, stated income loans, non traditional mortgage products, and other aspects of home mortgage lending.  My resume is attached as <u>Exhibit A.</u>

9. In addition, I have experience as an expert witness on home mortgage lending practices in connection with litigation.

## II. <u>DATA CONSIDERED:</u>

10. In forming my opinions in this case in addition to my formal education and years of experience I relied on data that was provided by counsel that includes, but are not limited to, deposition by Mr. Fisher, deposition by Mr. Myers, written report by Harold Justman, Equity One's response to special interrogatories, initial disclosures by Equity One Financial corp. and Erik Myers, complaint filed by Mr. Fisher, Bates stamped documents DS00001 to DS00766, ENE statement by Defendant Equity One Financial September 15, 2008 ENE Conference, and supplement to ENE statement by Equity One Financial

## III. <u>SUMMARY OF CONCLUSIONS</u>

4

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

11. I was asked by counsel for Mr. Fisher to review the evidence in this matter and to report on my opinions in regard to CAUSE OF ACTION 1 through 10. More precisely I was asked to give an opinion whether the practices of defendants Eric Myers, Equity One Financial Corp. (the "defendants") were in substantial compliance with minimal industry standards as a mortgage broker and for Mr. Fisher in the transaction at issue in this litigation. In addition, I was asked by Mr. Fisher's counsel to conduct an analysis of a report submitted by Harold Justman.

12. My report (ATTACHED) is based primarily on my preliminary review of the documents produced by the defendants and Mr. Fisher to date in this action. In arriving at my conclusions, I also relied on my education, and years of professional experience as a mortgage broker.

13. Upon initial review of the evidence described above, I do agree with a portion of Harold Justman's report. There are portions of Justman's report where I vigorously disagree. Specifically I disagree with numerous of his conclusions regarding the general standard of care for real estate agents and brokers, as well as the customary compensation for mortgage brokers and how compensation was set.

14. Upon review of ENE Statement by Defendant Equity One Financial September 15, 2008 ENE Conference (appears to be dated 9/4/2008) I agree with many of the facts stated but disagree with the interpretations. Specifically, I disagree with defense counsel's implied "simpler and more logical explanation" answer as to how the plaintiff received more than a half dozen loans dating back to 2002 whereas income on loan applications were inflated along with loan amounts. (page 1) I disagree with portions of subsection "e" (2008 ENE Conference) whereas I do agree with other statements in said section. Specifically I agree that "by refinancing with Downey, Plaintiff was able to live in his home for a few additional years…. [Avoiding] foreclosure by either Countrywide or Greenpoint. And third, since mid-2007, Plaintiff has not been making any payment on the Downey mortgage, thus essentially living in the home rent- and mortgage-free for more than a year." However, I disagree with implications that strictly lower monthly payments (compared to post Countrywide loan reset) are an absolute benefit to the plaintiff's financial outlook.

I have reviewed, among many others, the Fisher application that was brokered by Mr. Myers and

through Equity One and conclude that services rendered to Mr. Fisher were substandard and below the standard of care.

### IV.     **RESERVATION OF RIGHTS**

15.  The opinions expressed herein are based on the documents and information which I have reviewed to date and on my experience and knowledge of the industry at issue.

16.  I reserve the right to modify my opinions and expert report following the completion of discovery.

17.  To the extent that there are materials that I have not reviewed that alter the conclusions of this report, I reserve the right to modify my report to reflect these materials accordingly.  Such material might include deposition testimony in the case, additional documents that I have not had an opportunity to review, or reports by the defendants' experts.

18.  Additionally, I may testify regarding matters raised by the defendants or their experts which I have not considered for this report.

19.  Finally, to the extent that there are findings of law made by the Court that affect any of the conclusions discussed in this report, I also may provide testimony in light of those findings of law.

Dated: June ____, 2009                                   _____
                                                                                         Steven Krystofiak

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

**Expert witness report by Steven Krystofiak, Mortgage Broker.**

**To be distributed to all parties for;**

*Harry Donald Fisher v. Downey Savings and loan, Equity One Financial Corp, Erik Meyers.; In the United States District Court, Northern District of California San Francisco Division.*

The following expert witness report is prepared by Steven Krystofiak.

Important note, my continuous analysis of the case brought upon by Mr. Fisher is so far incomplete and is a work in progress due to the nature of discovery. Opinions can change in the future after receiving relevant information not limited to court papers and future depositions.

Upon initial review of documents given to me by the lawyers for Mr. Fisher I have found the following;

## Regarding witness report by Harold Justman

My opinion as to a mortgage broker's standard of care is based on the level at which the average, prudent mortgage broker in the industry would practice. It is how similarly qualified mortgage brokers would have managed the client's care under the same or similar circumstances.

I disagree with most of Mr. Justman's assertions on standard of care in respect to a mortgage brokers duties (referring to both opinion 1 and 3 of his report). By virtue of Mr. Justman's report and on evidence reviewed by him he seems to imply that a mortgage broker's duty is limited to pushing paper, make cold calls, and then reap commissions of over $20,000.

Opinion1: I believe Mr. Justman's first opinion walks on a very tight line. Specifically his opinion states that the standard of care of a mortgage broker does not require mortgage brokers to be financial advisors. Though a financial advisor is a profession within itself, a standard of care for a licensed mortgage broker does require said broker to give financial advice as to help clients better understand

7

mortgage products (both sophisticated and "vanilla") which are leveraged on arguably the largest asset most American's own, their homes. Besides my experiences as a mortgage broker I reason assertion by citing 2 separate documents that have been brought into evidence.

First the "Mortgage Broker Fee Disclosure," whereas in section 1 paragraph three it explains, "…*Mortgage broker seeks to assist you in meeting your financial needs*…" Such disclosure is typical for borrowers to sign.

Second is a document submitted by defendant's counsel with a packet dated 9/12/2008. The document is made by Pacific Coast Funding and dated 5/10/2002. At the bottom of the letter it stated, "*Should you have any questions regarding loan amount, interest rate, appraisal, or* **loan programs**, *please contact your loan officer.*" This confirms my statements that a mortgage broker does give advice on loan programs and helps act as a financial advisor.

Opinion 2: I generally agree with opinion number 2. It is outside the scope of a mortgage brokers duties to make recommendations about selling a home. Selling a home and brokering a loan are 2 completely different transactions.

Opinion 3: Completely disagree, my conflicting observations and reasoning are stated above.

Opinion 4: I agree that the standard of care that a mortgage broker must provide does not include verifying the accuracy of the income information provided by the borrower. Though I disagree with the reasoning that Mr. Justman provides. It is not customary that the mortgage broker only gather the information necessary to obtain the lenders approval of the loan. In the process of brokering a loan all available information must be gathered first, and then appropriate lenders are chosen. Mr. Justman's reasoning can best be described inaccurate while using the logic of "putting the cart before the horse." This is additionally argued since stated income loans offer higher interest rates and are less desirable when compared to fully documented income loans. A mortgage broker would want to obtain as much income verification up front. It is also acceptable for mortgage brokers and lenders to double check

8

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

incomes/ job title/ and location demographics to stated income. Such rudimentary checks can be done by looking at website such as www.salary.com and searching zip code and job titles for stated incomes.

Opinion 5: In all I agree. While a brokers duty does not encompass advice regarding selling the borrowers home, when a borrower, such as Mr. Fisher, is financially unqualified to refinance his home, it is a brokers duty to tell the borrower that the broker can not help in. That way the borrower would then be free to investigate options other than obtaining a new loan he can not afford.

Opinion 6: Both the GFE and the TLD that were provided from Equity One Financial Corp were inaccurate at best, and misleading or illegal at worst.
The GFE says that the interest rate is 1.1%. Though this is true it is misleading and has undertones of conspiracy between Equity One and Downey Savings against Mr. Fisher. That is the "note rate" aka the interest rate for only 1 month. It is misleading because that rate just happens to be the minimum monthly payment rate that will stay fixed for the next 11 months. Important note: the minimum payment rate is not what is actually being charge from the lender to Mr. Fisher. The implication is that the actual interest rate is 1.1%, whereas in fact after 1 month it shoots up to a higher note rate which is calculated when adding the margin rate with the index rate.

There were many TLD that I reviewed in evidence. Not 1 was accurate. The chronologically 1st one I found was signed by Mr. Fisher on 4/14/05. (DS00424). The inaccurate nature of this document is vast and similar mistakes were made on subsequent TLD's. In regards to the TLD signed on 4/14/05 most misleading is the portion stating that there will be 479 payments for only $991.80, and stating the APR will be 1.25%.
I have never seen a mortgage which will carry a life APR of 1.25%. It also does not accurately inform Mr. Fisher about the impending prepayment penalty that would have been added to the loan.

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

On the TLD it is standard practice to calculate future "amount of payments" at the present note rate (current index plus margin). On the TLD's that I have come across in evidence I have only seen future payments set at artificially lower minimum monthly payments which is highly misleading.

Opinion 7: I agree with Mr. Justman's claims in this opinion. I do feel some related information was left out in related matters of how signatures are obtained on applications. In most industries an application is a starting process, where one begins. In the mortgage industry it is common to have multiple "applications" during the process of brokering a single loan. Commonly the lender and/or broker will put a "final" application into the stack of closing documents. Said closing documents can easily reach over 100 pages, where well over 50 signatures and initials can be required in a short amount of time, at which time transitionary applications are then discarded.

Opinion 8: I can not find another mortgage broker that agrees with this opinion. Making close to 5 points on a $416,000 loan (over $20,000) is not "customary." When I have told several others about such a high commission I have received responses ranging from self admitting stomach sickness to awkward and eerie laughter. I can not strongly enough disagree with almost every word of opinion 8. Lastly the compensation was not set by the lender; it was set by the broker. Each interest rate is associated with a certain Yield Spread Premium (YSP) A.K.A. rebate or commission. Since the note rate and margin were most likely chosen by the broker, not the lender, it is the broker who was over whelmingly greedy to have made that commission on said loan. A typical commission on a loan where the amount is $416,000 would be between 1-2 points. I feel there is a consensus within the industry that making 3 points (let alone making over 2) on a loan that large would be considered beyond excessive. 2 points on a $416,000 loan would be $8320, whereas 4.926 points is $20,494.68.

## **Disagree with assertions made by defendant's counsel**

I disagree to the defendant's counsel's implied "simpler and more logical explanation" answer as to how the plaintiff received more than a half dozen loans dating back to 2002 whereas income on loan applications were always inflated along with loan amounts.

Once a consumer obtains a loan that they could not afford one starts to live, pay bills and day to day expenses on credit and the consumer becomes reliant on said credit. It appears that the initial loan on the

property was affordable to Mr. Fisher. Somewhere down the line a larger loan came along which seemed to be unaffordable to Mr. Fisher. Having reviewed the credit report it appears that Mr. Fisher relied on many credit cards to supplement his income, due to so much of his income going to mortgage payments. This was a financial arrangement that could have kept going, as long as home prices kept climbing and new mortgage brokers kept calling offering to refinance and strip equity away from his home. Eventually home prices went flat, and no more equity could be used to pay off credit cards. It is very plausible to believe that Mr. Fisher never initially offered or ever knew about his income being falsified on numerous mortgage applications. It is hard for me to imagine someone outside of the mortgage industry to even know how much income is believable and necessary to put on a mortgage application as to facilitate a loan being funded.

If the assertion by the defendant's counsel is correct that Mr. Fisher was an expert at falsifying loan applications and it was his modus operandi then Mr. Fisher should have known that a mortgage brokering being awarded 5 points in commission was too high, and he should have shopped elsewhere. This leads me to believe that the defendant's assertion is a less logical scenario.

## **Cause of Action 1 - 10**

1. Having examined the evidence presented to me I firmly believe that there was a disregard by the creditor for the borrowers ability to repay as defined by 226.32.

2. The subject of elder abuse is outside of my expertise. I will agree that there were excessive fees charged to the plaintiff.

3. It appears that there were misrepresentations on the loan documents, not limited to the loan application. It is hard for me to believe that someone outside of the mortgage industry without access to specific software and ones own credit report would know which income is appropriate to falsify on an application which would lead to an approval. Typically industry insiders are privy to that software, information and calculations.

4. Unable to find documents to support or rebuke claims.

5. As far as misrepresentations on loan applications I again firmly believe that someone outside of the mortgage industry without access to specific software and ones own credit report would know which

11

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

income is appropriate to falsify on an application which would lead to an approval. Typically industry insiders are privy to that information and calculations.

6. Outside of my scope of expertise

7. I believe my statements about the TLD above (about opinion 6 of Mr. Justman's report) act as a proper response to this cause of action.

8. I believe my statements about the TLD above (about opinion 6 of Mr. Justman's report) act as a proper response to this cause of action.

9. The type of loan (NEG AM) and how it was presented in documents in evidence show signs of defendants conspiring between and amongst themselves against the plaintiff.

10. Outside of my scope of expertise

## Other observations

The Citibank loan did not have a commission of 1% ($750) That was only a portion of the compensation received by Equity One. EQ001 shows that on top of the $750 paid as a commission from Citibank to Equity One, there was also a charge of $3265.00 directly to Mr. Fisher. This totals an unbelievable 5.35 points that was made on the 2nd loan. EQ066 shows that a $750 rebate (commission) was paid to all Citi HELOC's between $35,001 and $75,000. Making over $4000 on a $75,000 HELOC shows greed and is not customary for industry standards.

There was a markup on the credit report. The credit report cost was $12.10 (EQ033) but on closing documents Mr. Fisher was charged $35. This is against the standard of care for mortgage brokers.

The application (aka 1003) on page 2 shows that the proposed 1st mortgage which includes P&I as $1071. (DS00322)  This again is misleading. That proposed amount was not even close take care of the P&I, which stand for the principal and interest, of the loan.

It is typical for a borrower to sign two "right to cancel" pages at closing. Some banks even require 3 separate "right to cancel" pages to be signed.  I only found one signed.

DS00517 is a simple document that does a decent job explaining how interest rates change, and how the loan is a negatively amortized loan. Too bad this is dated 5/31/07. A similar page trying to explain a complex and confusing NEG AM loan was not provided at origination. I believe this helps show how there was a conspiracy between Equity One and Downey by holding back on this information at the onset of the origination process.


If there are any questions please feel free to contact me at 650-716-8187 or via e-mail at Krystofiakgroup@aol.com

Humbly submitted,
Steven Krystofiak

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

# Mortgage Broker Expert Witness CV

**Steven Krystofiak**

503 Tiller Lane

Redwood City, Ca 94065

650-716-8187

Krystofiakgroup@aol.com

**ORAL TESTIMONY TO GOVERNMENT PANELS**

June of 2006: Gave oral testimony at Federal Reserve Board Hearings on "responsible lending and informed consumer choice"

http://www.federalreserve.gov/events/publichearings/hoepa/2006/20060616/transcript.pdf

July of 2006: Written testimony delivered to the Federal Reserve board on stated income loans and their association with fraud

http://www.federalreserve.gov/SECRS/2006/August/20060801/OP-1253/OP-1253_3_1.pdf

February of 2007: Gave oral testimony at California State Senate Hearings on "non traditional mortgage products."

March of 2007: Gave oral testimony at California State Senate Hearings on "reactions to the recent subprime mortgage collapse."

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT

**EDUCATION**

Bachelor of Science degree in <u>Real Estate</u> from San Diego State University, Ca

**MEMBERSHIP**

Founder of the Mortgage Broker Association for Responsible Lending

CA DRE Broker License No. 01341058

**PUBLICATIONS BY STEVEN KRYSTOFIAK**

**For Inman News**

What is a subprime loan? It depends on whom you ask 3/07

High-risk loans enable buyers to obtain, not afford, homes 3/07

Why home-ownership shortcuts will lead to longer recovery 4/07

Sales pitch all smoke and mirrors; Negatively amortized loans add up to big profits for banks 4/07

Negatively amortized loans to cause much pain in 2008 4/07

**Articles fact checked and/ or quoted in**

Stated-income loans can pose risks, AP 8/06

Refinancing From an ARM to a Fixed-Rate Home Loan, Wall Street Journal, 9/06

Liars' Loans Could Make Many Moan, NY SUN 12/06

On Housing, 'Worst Is Yet To Come', NY SUN 3/07

U.S., State Lawmakers Acting to Help Subprime Borrowers, The Commercial Record 4/07

For sale: Scenes from a bubble, Money Magazine 5/07

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans, Washington Post 5/07

Mortgage-rate hike may impel buyers, San Diego Tribune 6/07

Mortgage Brokers: The salesman factor, Money Magazine 8/07

Loans Built on Lies, Press Democrat 1/08

Adjustable loans spur new worries, LA Times 1/08

**EXPERIENCE**

2005-present
An Independent Mortgage Broker in Redwood City, Ca

2006-present
President of the Mortgage Broker Association for Responsible Lending

2002-2005
Mortgage & Realty Professional Services La Jolla, Ca
Loan Officer

PLAINTIFF'S EXPERT TRIAL WITNESS QUALIFICATIONS AND EXHIBIT